UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN ANDREW DORN,

        Petitioner,

v.                                CASE NO. 2:06-11993
                                   HONORABLE NANCY G. EDMUNDS

BLAINE LAFLER,

        Respondent.

_____/

**OPINION AND ORDER**
**(1) DENYING THE HABEAS CORPUS PETITION,**
**(2) DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT,**
**(3) DENYING PETITIONER'S MOTION TO PROCEED IN FORMA PAUPERIS, AND**
**(4) GRANTING IN PART PETITIONER'S MOTION FOR A RULING**
**ON HIS MOTION FOR SUMMARY JUDGMENT**

      Petitioner John Andrew Dorn has filed a *pro se* application for the writ of habeas corpus

under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for assault

with intent to do great bodily harm less than murder and possession of a firearm during the

commission of a felony (felony firearm). Respondent urges the Court to deny the habeas petition

on the grounds that Petitioner's claims are procedurally defaulted, not cognizable on habeas

review, or meritless. The Court agrees. Therefore, the habeas petition must be denied.

**I. Background**

      Petitioner was charged in Kalamazoo County, Michigan with three counts: (1) assault

with intent to commit murder, (2) felon in possession of a firearm, and (3) felony firearm. The

prosecutor dismissed the felon-in-possession charge on the first day of the jury trial, and on April

10, 1998, the jury found Petitioner guilty of the lesser-included offense of assault with intent to

commit great bodily harm less than murder, MICH. COMP. LAWS § 750. 84, and felony firearm, MICH. COMP. LAWS § 750.227b.  The trial court sentenced Petitioner as a fourth habitual offender to two years in prison for the felony firearm conviction and to a consecutive term of fifteen to thirty years for the assault conviction.

Petitioner filed a claim of right, which the Michigan Court of Appeals dismissed for lack of jurisdiction because the claim was untimely.  Petitioner subsequently filed a timely application for leave to appeal in which he asserted that:  the trial court improperly refused his request for an instruction on a lesser-included offense; his sentence was based on inaccurate information and was disproportionate to the offense and to the offender; his out-of-state conviction should not have been used to enhance his sentence; the prosecutor's conduct deprived him of a fair trial; his trial attorney was ineffective; and the cumulative effect of errors deprived him of a fair trial.  The Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented."  *See People v. Dorn*, No. 219394 (Mich. Ct. App. Oct. 2, 2000) (unpublished).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, which initially held his case in abeyance pending decisions in *People v. Cornell*, (Docket No. 115833) and *People v. Silver* (Docket No. 117024).  *See People v. Dorn*, 630 N.W.2d 621 (2001)(table). The Michigan Supreme Court rendered decisions in *Cornell* and *Silver* in June of 2002,[1] and on September 17, 2002, the court denied Petitioner's application for leave to appeal.  The reason given was that it was not persuaded to review the issues.  *See People v. Dorn*, 467 Mich. 871;

---

[1] *See People v. Cornell*, 466 Mich. 335 (2002); *People v. Silver*, 466 Mich. 386 (2002).

651 N.W.2d 919 (2002) (table).[2]

On September 16, 2003, Petitioner filed a motion for relief from judgment in which he raised some new issues, but also presented some of the same claims that he had raised on direct review of his convictions. The trial court denied Petitioner's motion because he was arguing issues previously raised on direct appeal. The trial court found no merit in Petitioner's new claims about the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266 (1988), or the retroactive application of the Michigan Supreme Court's decision in *Cornell*.

Petitioner appealed the trial court's decision, claiming that (1) he had been denied an appeal, (2) the trial court erroneously denied his request for an instruction on a lesser-included offense, and (3) retroactive application of *Cornell* violated his constitutional rights. The Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D)." *See People v. Dorn*, No. 260553 (Mich. Ct. App. Aug. 16, 2005) (unpublished). On January 27, 2006, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Dorn*, 474 Mich. 1020; 708 N.W.2d 385 (2006).[3]

Petitioner filed his habeas corpus petition on May 1, 2006. His claims are:

I.      In denying John Dorn an appeal, either by right or by leave, the

_____

[2] Supreme Court Justice Marilyn Kelly voted to grant leave to appeal.

[3] Justice Marilyn Kelly wrote a dissenting opinion in which she stated:

        I would remand to allow the defendant his appeal as of right. Defendant lost that right because of the late filing of his petition. He alleges prison officials caused the late filing by delaying the mailing of his petition. This is another case that cries out for the Supreme Court to take action to adopt a prison mailbox rule in Michigan.

State deprived him of his constitutional right to an appeal, equal protection of the law, and due process, under the state and federal constitutions and law.

II.     In denying a proper request for an appropriate instruction on a lesser included offense, the trial court abused its discretion, invaded the province of the jury, and deprived John Dorn of his constitutional right to present a defense, a fair and impartial trial, and due process under the state and federal constitutions and law.

III.    As retroactively applied to John Dorn's case, *People v. Cornell*, 646 N.W.2d 127 (Mich. 2002), violates the state and federal constitutions' prohibitions against ex post facto laws, and under the dictates of due process should not apply retroactively.

IV.     Due process requires John Dorn to be sentenced based upon accurate information, under the state and federal constitutions and law.

V.      John Dorn's 15-30 year sentence for assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84, was not proportionate to the offense or offender, individualized, or proportionate to the sentences meted out to other offenders for the same or similar offenses, depriving him of his constitutional right to due process under the state and federal constitutions and law.

VI.     The prosecutor impermissibly engaged John Dorn in vouching for the credibility of the prosecution's witnesses, depriving him of his constitutional right to a fair and impartial trial, and due process under the state and federal constitutions and law.

VII.    The prosecutor impermissibly commented on John Dorn's exercise of his constitutional right to trial, to testify, and to present a defense, in requesting a 15-30 year sentence, depriving him of a fair and impartial sentencing, and due process under the state and federal constitutions and law, and giving rise to a presumption of vindictiveness in the 15-30 year sentence received.

VIII.   John Dorn was denied the effective assistance of counsel, depriving him of a fair and impartial trial and sentencing, and due process under the state and federal constitutions and law.

IX.     The cumulative effect of the trial court, prosecution, and counsel's errors, deprived John Dorn of a fair and impartial trial and

sentencing, and due process under the state and federal
constitutions and law, requiring reversal of his convictions, a new
trial, and resentencing, to otherwise prevent a miscarriage of
justice.

Also pending before the Court are (1) Petitioner's motion for summary judgment, which

reiterates his claim that he was denied an appeal in state court, (2) Petitioner's motion to proceed

*in forma pauperis*, and (3) Petitioner's motion for a ruling on his motion for summary judgment.

The third motion also seeks appointment of an investigator and an attorney and immediate

release from confinement on Petitioner's own recognizance.

## II.  The Facts

The convictions and sentence arose from an altercation between Petitioner and Walter

Anderson in Bronson Park in Kalamazoo, Michigan on October 20, 1997.  Anderson was shot in

the leg during a scuffle with Petitioner.  The prosecutor's theory was that Petitioner was angry

with Anderson because Anderson informed Petitioner's companion of several years, Steven

Hegler, about Petitioner's sexual encounter with Anderson about two weeks before the shooting.

Anderson testified that, after the bar closed early on Monday morning, October 20, 1997,

he walked to Bronson Park with Lamar Jamaun Harkness.  Petitioner approached him and

demanded to know why Anderson had told Steven Hegler that Anderson and Petitioner had been

sexually intimate.  Petitioner jabbed Anderson's chest, but Anderson pushed his hand away.

When Petitioner jabbed Anderson's chest a second time, Anderson stepped back.  Petitioner bent

down and picked up a gun, which he put behind him in his belt loop.  As Anderson walked away

from Petitioner and prepared to leave the park, Petitioner grabbed him from behind and placed a

gun at the back of his head.  Anderson told Petitioner to take the gun away from his head.

Petitioner responded, "Shut up, bitch, before I blow your brains out."  Petitioner dragged

Anderson backward and then walked around to the front of him. He pointed the gun against Anderson's forehead, and said, "You gonna tell me why you told Steve that. I'm gonna teach you about breaking up other folks' happy homes." Anderson took a couple of steps backward. Petitioner then lowered the gun and fired two gunshots below Anderson's waist. Anderson did not realize he had been shot. He lunged at Petitioner and grabbed him around the neck. Petitioner staggered, and as his arm went up, Anderson grabbed Petitioner's wrist, and the two of them wrestled over the gun. Four more shots were fired into the air while Petitioner's finger was on the trigger. Petitioner jerked away from Anderson and attempted to fire two shots at Anderson's chest, but no bullets came out, and the gun clicked twice. The two men exchanged a few more words and then walked away from each other. When Anderson realized that he had been shot in the leg, he walked to a gas station with Harkness' help. The police were called, and Anderson was taken to the hospital where he was treated. He claimed at trial that he never took possession of the gun and did not touch the trigger of the gun.

Lamar Jamaun Harkness testified that he was seated across the street during the altercation between Petitioner and Walter Anderson. According to Harkness, Petitioner grabbed Anderson's arms and would not let go. When Petitioner eventually released Anderson's arm, he pulled out a gun and aimed it at Anderson's face. Anderson grabbed one of Petitioner's hands as if to push away the gun. The gun then fired into the air. Petitioner subsequently aimed down toward the ground or at Anderson's legs and began to fire the gun.

Willie McCree testified that he was seated in Bronson Park on October 20, 1997, when Petitioner walked up to him and said that he was looking for Walter. McCree was concerned by Petitioner's demeanor because it seemed like Petitioner wanted to fight. The prosecutor asked

McCree if he was in custody for an uttering and publishing charge. McCree answered that he was in custody for a probation violation.

Melvin Emmans testified that he observed Petitioner conversing with another person shortly after 2:00 a.m. on October 20, 1997. Emmans was seated in his car at the time. He noticed Petitioner pull something like a weapon out of his boot and put it in the back of his pants. The other individual had a hold of Petitioner's arm as if to keep it away from him. Emmans recalled seeing Petitioner's hand raised toward the other person's head as if he were pointing a gun. He heard three or four shots, one of which was fired into the air and one which was fired at the ground. The gun was in Petitioner's hand at the time. As Emmans prepared to leave the area, Petitioner walked toward him, got into his car, and gave Emmans directions to Petitioner's apartment. On the way there, Emmans heard bullets falling out of the gun that Petitioner was holding.

Lenell Mayfield testified that he currently was residing in a boot camp program, but on October 20, 1997, he lived with Petitioner and Steven Hegler, who were "significant others." About 1:00 a.m. on October 20, 1997, Petitioner asked Mayfield to take him somewhere. Mayfield thought that he saw the butt of a gun at Petitioner's waist, and he refused to give Petitioner a ride because he wanted to stop Petitioner from doing whatever it was he planned to do. Mayfield later heard Petitioner return home. The police arrived about five minutes later and took Petitioner out of the house.

Several police officers testified that they responded to a dispatcher's call, learned that Petitioner was a suspect, searched Bronson Park for evidence, and ultimately arrested Petitioner at his apartment. They found a gun in the stove. Detective Scott Melo testified that, when he

interviewed Petitioner in jail, Petitioner stated that he was intoxicated at the time of the shooting and that he did not try to kill the victim.

Petitioner testified that he had a heated discussion with Walter Anderson at Bronson Park on October 20, 1997. He admitted that he brought a gun with him to the park, but he claimed that he carried it there for personal safety reasons because he previously was the victim of a mugging in the park. He stated that the gun twice fell through his pant leg to the ground. The first time, he bent over and put it back in his waistband. The second time that the gun fell to the ground, both he and Anderson bent over and tried to pick it up. When they straightened up, Anderson grabbed his hand, and they struggled over the gun. The gun discharged two times as Anderson tried to wrench the gun out of Petitioner's hand. Petitioner was holding the gun at his side at the time, and the barrel of the gun was pointed toward the ground. The two of them froze for a moment and then resumed their argument and struggle over the gun. Anderson pushed his arm into the air, but Petitioner managed to push Anderson away and to bring his arm down. That was the end of the struggle over the gun. Lamar Jamaun Harkness led Anderson away, and Petitioner got into Melvin Emmans' car. On the way home, he emptied bullets out of the gun. He did not realize that he had shot Anderson.

On cross-examination by the prosecutor, Petitioner admitted that he loaded the gun and took it with him to Bronson Park on October 20, 1997. He also admitted that he had been upset with Walter Anderson and that his finger was on the trigger when the gun discharged. Although he later said that he must have misspoken if he testified that his finger was the only one on the trigger, he declined the prosecutor's invitation to correct his former testimony and then stated once again that his finger had been on the trigger.

## III. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, section "2254(d) dictates a highly

deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). In addition, "state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).

## IV. Discussion

### A. Lack of an Appeal of Right

Petitioner alleges that he was denied an appeal of right or by leave because the Michigan Court of Appeals rejected his claim of right as untimely. He asserts that the tardy claim of appeal was not his fault, but instead was the result of correctional officials' delay in processing his outgoing mail.

A state is not obligated to provide appellate review of criminal convictions. *Halbert v. Michigan*, 545 U.S. 605, 610 (2005). If a state does provide a means of appealing a conviction, the state must satisfy the requirement of due process, which "emphasizes fairness between the State and the individual dealing with the State . . . ." *Ross v. Moffit*, 417 U.S. 600, 609 (1974). The denial of an entire judicial proceeding, "which a defendant wanted at the time and to which he had a right . . . demands a presumption of prejudice. Put simply, [courts] cannot accord any presumption of reliability to judicial proceedings that never took place." *Roe v. Flores-Ortega,* 528 U.S. 470, 483 (2000) (internal quotation marks omitted).

While it is true that Petitioner was not permitted to appeal his convictions as a matter of right, Petitioner incorrectly alleges that he was denied an appeal. He pursued two complete rounds of discretionary appeals in state court. On direct review, the Michigan Court of Appeals

denied leave to appeal "for lack of merit in the grounds presented." This was a merits determination. *Abela v. Martin*, 380 F.3d 915, 923 (6th Cir. 2004). The Michigan Supreme Court likewise had an opportunity to review Petitioner's claims.

Petitioner subsequently filed a motion for relief from judgment, which the trial court denied in a reasoned opinion. Petitioner then applied for leave to appeal in the Michigan Court of Appeals and in the Michigan Supreme Court. Although the state appellate courts determined that Petitioner had not established entitlement to relief, Petitioner was not precluded from raising his claims in state court. He was afforded a direct appeal and received a ruling on the merits of his claims. He also was afforded a state collateral appeal. The appeal process was not entirely nonexistent, nor "presumptively unreliable" such that a presumption of prejudice has occurred. Accordingly, Petitioner has no right to habeas relief on the basis of his first claim.

## B. The Jury Instructions

Petitioner was charged with assaulting Walter Anderson with intent to commit murder. He alleges that the trial court deprived him of a fair trial and his right to present a defense by denying his request for a jury instruction on the misdemeanor offense of careless, reckless, negligent discharge of a firearm, causing injury or death. *See* Mich. Comp. Laws § 752.861 ("Any person who, because of carelessness, recklessness or negligence, but not wilfully or wantonly, shall cause or allow any firearm under his immediate control, to be discharged so as to kill or injure another person, shall be guilty of a misdemeanor . . . .").

The United States Supreme Court has not held that due process requires the giving of jury instructions on lesser-included offenses in non-capital cases. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980). Consequently, the United States Court of Appeals for the Sixth

Circuit has concluded that "the Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (*en banc*)). "[F]ailure to instruct on a lesser included offense in a noncapital case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby*, 894 F.2d at 797). Therefore, Petitioner has no right to habeas relief on the basis of his claim about the jury instructions.

### C. The Retroactivity of *People v. Cornell*

While Petitioner's case was pending on direct review in the Michigan Supreme Court, the state supreme court issued its decision in *People v. Cornell*, 466 Mich. 335; 646 N.W.2d 127 (2002).[4] The State's High Court ruled in *Cornell* that state courts are precluded from instructing juries on cognate lesser-included misdemeanors. *Id.*, 466 Mich. at 359; 646 N.W.2d at 140. In contrast, "a requested instruction on a *necessarily included* lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Id.*, 466 Mich. at 357; 646 N.W.2d at 139 (emphasis added).[5]

---

[4] *Cornell* was overruled in part on other grounds by *People v. Mendoz*, 468 Mich. 527; 664 N.W.2d 685 (2003).

[5] "Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense." *Mendoza*, 468 Mich. at 532 n.3; 664 N.W.2d at 688 n.3 (citing *Cornell*, 466 Mich. at 356; 646 N.W.2d at 127). "Cognate offenses share several elements, and are of the same class or category as the greater offense, but the cognate lesser offense has some elements not found in the greater offense." *Id.*, 468 Mich. at 532 n.4; 664 N.W.2d at 688 n.4 (citing *Cornell*, 466 Mich. at 344; 646 N.W.2d at 127).

Three months after the Michigan Supreme Court issued its decision in *Cornell*, it denied leave to appeal in Petitioner's case. Although the state supreme court did not say that it was relying on *Cornell* to deny Petitioner's application for leave to appeal, it ruled in *Cornell* that its decision was "to be given limited retroactive effect, applying to those cases pending on appeal in which the issue has been raised and preserved." *Id.*, 466 Mich. at 367; 646 N.W.2d at 145. Petitioner's case was pending on appeal when *Cornell* was decided, and Petitioner maintains that the state supreme court applied *Cornell* to defeat his claim that the trial court should have instructed the jury on the misdemeanor offense of careless, reckless, negligent discharge of a firearm. Petitioner argues that retroactive application of *Cornell* violated the constitutional prohibition against *ex post facto* laws.

## 1. Legal Framework

The Constitution prohibits Congress and the states from passing *ex post facto* laws. *See* U.S. CONST. art. I, § 9, cl.3 and art. I, § 10, cl.1. "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925).[6] Assuming, for the sake of argument,

---

[6] *See also Calder v. Bull*, 3 U.S. 386, 390 (1798), where the Supreme Court explained that e*x post facto* laws include:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law

that *Cornell* was applied to Petitioner's case, the only provision of *Beazell v. Ohio* that is applicable here is the phrase "deprives one charged with crime of any defense available according to law at the time when the act was committed."

## 2. Application

Petitioner was charged with the felony offense of assault with intent to commit murder. Careless, reckless, or negligent discharge of a firearm is a cognate lesser-included offense of assault with intent to commit murder. *People v. Lowery,* 258 Mich. App 167, 173-74; 673 N.W.2d 107, 111 (2003). Thus, under *Cornell*, Petitioner was not entitled to an instruction on careless, reckless, or negligent discharge of a firearm. *Cornell* instructs that a jury can be instructed only on necessarily included lesser offenses. Prior to *Cornell*, state courts were permitted to instruct a jury on a misdemeanor lesser- included offense if the defendant made a proper request for such an instruction, an appropriate relationship existed between the charged offense and the requested misdemeanor, the requested misdemeanor was supported by a rational view of the evidence adduced at trial and the requested instruction would not result in undue confusion or some other injustice. *People v. Stephens*, 416 Mich. 252, 261-65; 330 N.W.2d 675, 680-81 (1982), *overruled by Cornell*, 466 Mich. at 335; 646 N.W.2d at 127.

Petitioner requested a jury instruction on careless, reckless, negligent discharge of a firearm after closing arguments and prior to the trial court's charge to the jury. The trial court declined to give the requested instruction, but agreed to discuss the issue at a later time. The actual discussion occurred after the court charged the jury and excused the jurors to begin their

---

required at the time of the commission of the offense, in order to convict the offender.

deliberations. The trial court stated that it could call the jury back and read the requested instruction, but that the instruction was inappropriate in light of the evidence and it did not fall within the rules for lesser-included misdemeanor offenses. The court took particular note of the fact that Petitioner waived any request to instruct the jury on the lesser-included offense of felonious assault, which is a four-year felony. The court also stated that the evidence did not justify reading the instruction even if the evidence were viewed in Petitioner's favor. (Tr. Apr. 9, 1998, at 238-40.)

The record supports the trial court's decision not to instruct on careless, reckless, negligent discharge of a gun. According to the testimony, Petitioner armed himself and then went to Bronson Park where he looked for Walter Anderson. Anderson claimed that, during the subsequent altercation with Petitioner, Petitioner bent down, picked up a gun, and tucked the gun in his waistband. As Anderson walked away, Petitioner followed him, placed a gun next to Anderson's head, and threatened to "blow [his] brains out." Petitioner subsequently fired the gun two times at Anderson, who claimed at trial that those gunshots were fired *before* he lunged at Petitioner and engaged in a physical struggle to control the gun.

Even if the jury chose to believe Petitioner's testimony that the gun went off as he wrestled with Anderson for control of the gun, Petitioner admitted that his finger was on the trigger at the time. He even declined the prosecutor's invitation to change his testimony to say that Anderson also had his finger on the trigger.

Although the jury ultimately found Petitioner guilty of the lesser-included felony offense of assault with intent to do great bodily harm less than murder, the evidence did not support a conviction on the misdemeanor offense of careless, reckless, or negligent discharge of a firearm.

15

The evidence suggested that Petitioner was the aggressor in the incident and that his conduct was intentional, not careless, reckless, or negligent. Therefore, even under the more favorable version of the law as it existed at the time of Petitioner's trial, the lack of a jury instruction on careless, reckless, or negligent discharge of a firearm could not have had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[7] It follows that the Michigan Supreme Court's alleged application of *Cornell*, which precludes jury instructions on cognate lesser-included misdemeanor offenses, was harmless.

### D. The Sentence

The fourth and fifth habeas claims challenge Petitioner's sentence. Petitioner alleges that his sentence was based on inaccurate information in his presentence report and that his sentence was disproportionate to the offense, to the offender, and to sentences meted out to other offenders for the same or similar offenses. The Michigan Court of Appeals rejected these claims for "lack of merit in the grounds presented."

#### 1. Inaccurate Information

Petitioner claims that he was sentenced on the basis of a pre-sentence report, which contained at least four falsely reported convictions. A sentence violates due process if it is based on "misinformation of constitutional magnitude," *Roberts v. United States*, 445 U.S. 552, 556

---

[7] Last year, the Supreme Court reaffirmed that, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, 507 U.S. 619, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1966)]." *Fry v. Pliler*, __ U. S. __, __, 127 S. Ct. 2321, 2328 (2007).

(1980) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)), or on "extensively and materially false" information, which the defendant had no opportunity to correct. *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

Both Petitioner and his attorney stated at the sentencing that they had read the pre-sentence report, and both of them were given time to address the trial court and challenge the report. The trial court granted one defense request to change the report, denied other requests, and left open the possibility of amending the pre-sentence report if further research revealed inaccuracies in the report. Thus, Petitioner was not sentenced on the basis of extensively and materially false information that he had no opportunity to correct. The state appellate court's conclusion that Petitioner's claim lacked merit was objectively reasonable.

## 2. Proportionality

Petitioner contends that his sentence was not proportionate to the offense, because the victim contributed to his own injury and was not seriously injured. Petitioner also alleges that his sentence was disproportionate to the average sentence of 4.6 years for assault with intent to do great bodily harm less than murder. He claims that the sentencing guidelines for a fourth habitual offender such as him would be nineteen to seventy-six months, whereas his minimum sentence was 180 months.

A plurality of the Supreme Court has held that the Eighth Amendment to the United States Constitution contains no proportionality guarantee. *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991). The Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001 (Kennedy, J., concurring) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)). "The gross disproportionality principle reserves a constitutional violation for only the

extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

The Supreme Court determined in *Hutto v. Davis*, 454 U.S. 370 (1982), that forty years in prison for possession and distribution of approximately nine ounces of marihuana was not cruel and unusual punishment under the Eighth Amendment. And in *Rummel v. Estelle*, 445 U.S. 263 (1980), the Supreme Court held that a recidivist's life sentence did not constitute cruel and unusual punishment even though the offense was obtaining $120.75 by false pretenses, a crime punishable by at least two years, but not more than ten years in prison.[8] More recently, the Supreme Court determined that a recidivist's sentence of fifty years to life imprisonment for two minor property offenses did not violate the gross disproportionality principle. *See Lockyer v. Andrade*, 538 U.S. at 63.

In light of these Supreme Court decisions, Petitioner's sentence of fifteen to thirty years for a violent act is not grossly disproportionate or unconstitutional. "Indeed, the Supreme Court has never held unconstitutional a sentence less severe than life imprisonment without the possibility of parole." *Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002). Therefore, the state appellate court's conclusion that Petitioner's claim lacked merit did not result in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

**E. The Prosecutor**

**1. Procedural Default Analysis**

The sixth and seventh habeas claims allege prosecutorial misconduct at trial and at sentencing. Although Petitioner says that he raised these claims in his motion for relief from

---

[8] Rummel's two prior felonies consisted of: (1) fraudulent use of a credit card to obtain $80.00 worth of goods and services, a felony punishable by two to ten years in prison; and (2) passing a forged check for $28.36, a crime punishable by two to five years in prison.

judgment, he did not raise the claims in the Michigan Court of Appeals and in the Michigan Supreme Court following the denial of his post-conviction motion.[9]  Thus, at first blush, the claims appear to be unexhausted because Petitioner did not raise his claims "in each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

Petitioner failed to pursue state remedies for his prosecutorial-misconduct claims while it was possible to do so, and he no longer has an available state remedy to exhaust.[10]  Therefore, his claims must be deemed procedurally defaulted, *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)), and the question is "whether cause and prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

---

[9]  Petitioner raised a claim about the prosecutor on direct review of his convictions, but the underlying grounds for his claim were different.  He claimed that the prosecutor's closing argument was designed to inflame and impassion the jury, that the prosecutor's argument regarding illegal possession of the gun was reversible error, that the prosecutor's question about whether a witness was concerned that Petitioner had a gun was improper, and that the prosecutor chose only *res gestae* witnesses who would testify favorably to her theory and failed to produce any *res gestae* witnesses who would not support her theory.  He also claimed that the prosecutor made gratuitous references to his medical condition, intimidated witnesses from testifying, abused her charging discretion, used perjured testimony, and suggested that Petitioner's presence at trial allowed him an opportunity to fabricate his testimony.  Here, in contrast, Petitioner alleges that the prosecutor vouched for her witnesses and improperly commented at sentencing on Petitioner's exercise of his constitutional rights.

[10]  Petitioner's only post-appeal remedy in state court is to file a motion for relief from judgment.  *See* Mich. Ct. R. 6.501 and the accompanying staff comment.  Petitioner filed one motion for relief from judgment, and he may not file another one unless he alleges a retroactive change in the law or a claim of new evidence.  Mich. Ct. R. 6.502(G).  He is not alleging newly discovered evidence or a retroactive change in the law, other than the *Cornell* decision, which he previously contested in state court.  Therefore, he is barred from filing another motion for relief from judgment in state court and he lacks an available state remedy to exhaust.

Petitioner has not alleged "cause and prejudice," nor shown that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Accordingly, his prosecutorial-misconduct claims are procedurally defaulted.

### 2. On the Merits

Petitioner's claims have no merit even if they are not procedurally defaulted. To prevail on his claim, a habeas petitioner must demonstrate that the prosecutor's conduct violated a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). On habeas review, the complained-of conduct must be both improper and flagrant, *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006), *cert. denied*, __ U.S. __, 127 S. Ct. 1376 (2007), and "'so egregious as to render the entire trial fundamentally unfair.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

### a. At Trial

Petitioner asserts that the prosecutor vouched for the credibility of her witnesses by repeatedly asking Petitioner whether the prosecution witnesses were lying or telling the truth.

> Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness. Generally, improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony.

*United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (citations omitted).

The prosecutor asked Petitioner several times whether certain prosecution witnesses were

20

telling the truth when they testified. (Tr. Apr. 9, 1998, at 173-75, 177-79.) This is an improper tactic in Michigan because the defendant's opinion of the credibility of prosecution witnesses is not probative of the matter. *People v. Buckey*, 424 Mich. 1, 16-17; 378 N.W.2d 432, 439-40 (1985). Petitioner, however, handled the prosecutor's questions well. He agreed with the prosecutor that some witnesses had told the truth, and he stated that other witnesses had lied.

Furthermore, it is not likely that the jury was misled by the prosecutor's questions. Petitioner's identity as the gunman was not disputed. The primary question was his intent. Because he implied on direct examination that the gun had discharged accidentally, the prosecutor was entitled to attack his credibility by suggesting that it differed significantly from the testimony of other witnesses. *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994). The prosecutor did not express her personal opinion on the credibility of the prosecution witnesses. Nor did she claim to have information, which was unknown to the jury. Therefore, the prosecutor's questions were not flagrant even if they were improper.

### b. At Sentencing

Petitioner alleges that, at his sentencing, the prosecutor improperly commented on his exercise of the rights to trial, to testify, and to present a defense. The record, however, indicates that the prosecutor merely asked the trial court to follow the sentencing guidelines. In support of her request, the prosecutor stated that Petitioner had been involved in the criminal justice system for fifteen years, was a violent person, and committed assaultive behavior while incarcerated. The prosecutor opined that Petitioner had manipulated the victim and minimized his criminal record.

Although the prosecutor stated that the jury had spoken loudly and clearly when it

determined that Petitioner was guilty of assault with intent to commit great bodily harm, this was not a vindictive remark meant to punish Petitioner for exercising his constitutional right to go to trial. The remark was merely a reflection on the fact that people who had written letters supportive of Petitioner were not present when the crime occurred and did not hear the testimony of people who were eyewitnesses. (Tr. May 11, 1998, at 26-29.) The Court concludes that the prosecutor's remarks at sentencing were not improper.

### 3. Summary

The prosecutor's conduct did not violate a specific constitutional right, nor infect the trial with such unfairness as to make the resulting conviction a denial of due process. Petitioner has no right to relief on the basis of his prosecutorial-misconduct claim.

### F. Trial Counsel

Petitioner asserts that his trial attorney deprived him of a fair trial and sentence by failing to prepare adequately for trial and sentencing. According to Petitioner, defense counsel: (1) failed to subpoena witnesses, who were available and willing to testify and who would have offered substantive, impeaching, and rebuttal testimony; (2) unilaterally waived a jury instruction on intoxication; (3) did not verify Petitioner's criminal history or challenge the content and accuracy of the pre-sentence report; (4) failed to object to prosecutorial misconduct; and (5) did not obtain promised leniency for Petitioner's cooperation with local and federal law enforcement agencies. The Michigan Court of Appeals found no merit in these claims.

### 1. *Strickland v. Washington*

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced

the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Because of the difficulties inherent in evaluating defense counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Although "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *id.* at 691, "the duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard,* 545 U.S. 374, 383 (2005). The test is whether the evidence which was not revealed, "taken as a whole, might well have influenced the jury's appraisal of [Petitioner's] culpability" and whether "the likelihood of a different result if

the evidence had gone in is sufficient to undermine confidence in the outcome actually reached . . . ." *Id.* at 393 (citations and quotation marks omitted).

### 2. Failure to call witnesses

Petitioner claims that defense counsel failed to investigate the fact that prosecution witnesses lied to the police when they said that certain people were present in Bronson Park when the crime occurred. Petitioner also claims to have informed counsel that two prosecution witnesses were smoking cocaine and drinking alcohol together on October 20, 1997, and that some witnesses had convictions for theft, armed robbery, forgery, and credit card fraud. Petitioner asserts that defense counsel failed to call witnesses who would have testified that Petitioner was intoxicated on the night of the shooting and that Petitioner never expressed any animosity toward the victim.

These allegations would not have made a difference in the trial even if they had been investigated and found to be true. The two witnesses who had criminal records admitted that they were in custody at the time of trial, and there was ample evidence that Petitioner and other trial witnesses had been drinking on the night of the shooting. The fact that witnesses misinformed the police about who was present in the park during the shooting was insignificant.

Petitioner also contends that Walter Anderson requested a knife before he confronted Petitioner and, after the shooting, admitted to a friend that he (Anderson) caused the gun to go off. According to Petitioner, Anderson also asked the friend to suggest to Petitioner that he would drop the charges if Petitioner paid him to do so.

Anderson admitted at trial that he probably said at the preliminary examination that he made Petitioner shoot the last four shots in the process of tussling with him. If Anderson's

alleged remarks to a friend had been elicited at trial, the remarks would have been inadmissible

hearsay on hearsay because Anderson supposedly made the comments to a friend who relayed the

information to Petitioner.

The overwhelming evidence at trial established that Petitioner sought out the victim and

was the aggressor in the affray. The evidence which he claims his attorney did not investigate or

present at trial likely would not have influenced the jury's appraisal of his culpability. The

evidence does not undermine this Court's confidence in the outcome reached by the jury.

Therefore, defense counsel's alleged failure to investigate and to present additional witnesses did

not amount to ineffective assistance.

### 3. Waiver of a Jury Instruction on Intoxication

Petitioner asserts that his attorney unilaterally waived a jury instruction on intoxication.

Defense counsel intentionally chose not to request a jury instruction on intoxication or self

defense, but the record does not indicate whether she consulted Petitioner on those matters. She

did discuss the lesser-included offense of felonious assault with Petitioner and decided not to

request a jury instruction on that offense. (Tr. Apr. 9, 1998, at 186-88).

Even assuming that defense counsel failed to consult Petitioner on the defense of

intoxication, the evidence did not support the defense. Although there was evidence that he had

been drinking, there was other testimony that he went to Bronson Park armed with a loaded gun.

At the park, he spoke with people, placed his gun next to Walter Anderson's head, and threatened

to kill Anderson. Petitioner also aimed his gun at Anderson's midsection and shot Anderson's

leg. After the shooting, he walked to an acquaintance's car, gave the acquaintance directions to

his home, and purposely discarded some bullets because he did not want to be found in

possession of a loaded gun.

In light of the evidence summarized above, the jury could have included that Petitioner was not so intoxicated as to be unable to assault Anderson and form the necessary intent to commit murder or great bodily harm less than murder. Therefore, it was reasonable trial strategy to waive an intoxication defense and maintain that the gun fired accidentally during the altercation with Walter Anderson.

### 4. Verifying Criminal History

Petitioner contends that his attorney did not verify Petitioner's criminal history or adequately challenge the content and accuracy of the pre-sentence report. Despite this allegation, the record indicates that a considerable part of the sentence proceeding consisted of defense counsel's challenges to the content and accuracy of the report. Furthermore, the prosecutor claimed to have a copy of records supporting Petitioner's previous convictions, and the trial court stated that defense counsel could concur with the probation officer and amend the pre-sentence report if a check of state court records revealed that Petitioner's prior convictions were falsely recorded. Any deficiency in defense counsel's performance at sentencing did not prejudice the defense.

### 5. Failure to Object

Petitioner alleges that his attorney should have objected to the prosecutor's misconduct. The prosecutor's conduct, however, either was proper or was improper, but not flagrant. Thus, defense counsel's failure to object to the alleged misconduct did not result in ineffective assistance of counsel.

### 6. Failure to Obtain Leniency

Petitioner states that his attorney did not obtain the promised leniency for Petitioner's cooperation with local and federal law enforcement agencies. The record, however, does not reflect cooperation with the police or an agreement to provide a lenient sentence in return for cooperation with the police. Therefore, defense counsel's failure to obtain leniency did not amount to deficient performance.

### G. The Cumulative Effect of Errors

The ninth and final habeas claim alleges that the cumulative effect of the errors at trial and during sentencing deprived Petitioner of a fair trial, fair sentence, and due process of law. "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Therefore, constitutional errors that would not individually support habeas relief simply cannot be cumulated to support habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied*, __ U.S. __, 127 S. Ct. 557 (2006).

## V. Conclusion

The state courts' rejection of Petitioner's claims did not result in an unreasonable determination of the facts or in decisions that were contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, the petition for a writ of habeas corpus [Doc. 1, May 1, 2006] is DENIED.

Petitioner's motion for summary judgment [Doc. 32, May 11, 2007], which claims that Petitioner was denied an appeal is DENIED because Petitioner was able to pursue two rounds of appeal in state court. Petitioner's motion to proceed *in forma pauperis* [Doc. 34, Feb. 29, 2008] is DENIED as moot because Petitioner paid the filing fee for this action when he filed his habeas

petition.  The motion for a ruling on the motion for summary judgment is GRANTED [Doc. 33,

Feb. 29, 2008] to the extent that Petitioner desired a ruling on  his prior motion.  The motion is

DENIED as to Petitioner's requests for an investigator, appointment of counsel, and immediate

release.


                              s/Nancy G. Edmunds_____
                              Nancy G. Edmunds
                              United States District Judge

Dated:  March 18, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel
of record on March 18, 2008, by electronic and/or ordinary mail.

                              s/Carol A. Hemeyer_____
                              Case Manager